The next argued case is No. 19-2384, Sol Viosys Co., Ltd. v. P3 International Corporation. Mr. Eisenberg, please proceed. Thank you, Your Honor. May it please the Court, Michael Eisenberg for Appellant Sol Viosys Co., Ltd. This case began like most patent litigations. In 2016, my client, Sol Viosys, purchased samples of a number of P3's products for analysis. One of those products was named the P7880 LED Bug Track. Based on reverse engineering analysis of the LED components within those products, Sol Viosys was able to confirm the presence of all structures required by the claims of the 207 patent. This litigation has been filed. Early in the case, the defendant, P3, produced some documents, including two purchase orders that P3 had placed with its supplier. The key fact, which neither party disputes, is that one purchase order occurred before the critical date for the 207 patent, and the other was from after. Do we know which batch of traps the one you tested came from? No, Your Honor, Judge O'Malley. We do not know that. The only party to this litigation who could have possessed that information was P3. In fact, P3 has said that it retained, in a cage, samples from each of those orders, and in fact said that it was able to distinguish between the orders and was able to explain that later shipped orders could have come from, to its customers, could have come from either order. But P3 never came forward with any evidence that would have linked the product as reverse engineered to either order. But it is true that in your complaint, you accused all the traps from all orders of infringement, did you not? Your Honor, fundamentally, the only thing a plaintiff can do is reverse engineer a product and assert that products consistent with that analysis are infringing. Now, the question of what eventually gets included into a damages base based on determining which products are consistent with that theory of infringement, that is a burden that both parties, under the proper standard, share equally. So you didn't have the opportunity to take any discovery with respect to where the traps you tested came from? Your Honor, what happened was we included our allegations and then P3 came forward with these purchase orders and said, well, all of these must have been the same, and therefore your patent is invalid. And what Sol Semiconductor did was wait for P3 to prove up its defense to come forward with either evidence showing that the product that was reverse engineered came from the first batch or that the LED components, as they existed in the reverse engineered sample, were consistent, the relevant features were consistent with the first batch. This all goes back to... So I guess... Go ahead. I'm sorry, go ahead, Judge O'Malley. No, I was going to say, I guess that the answer to your question is that you did not. You had the opportunity to do the discovery, but you chose not to do it. Well, yes, Your Honor. We had the opportunity to prove up infringements and P3 had the opportunity to prove up its invalidity defense. And the question of whether Sol Biasis conducted a discovery in order to prove up P3's invalidity defense, no, Your Honor. And the law squarely, clearly, and throughout the litigation provides that the burden to establish invalidity, this is from eye for eye and the burden exists throughout the litigation, rests upon the party raising it. Mr. Eisenberg, the record contains at least one deposition and a couple of declarations from representatives of P3 in which they assert that the two batches of the bug traps were identical. So why isn't that sufficient to satisfy their burden, if they have one, of showing that your allegation of infringement must necessarily walk you into an invalidity situation since they can demonstrate that some of the products at least were sold prior to the critical date? Well, the fundamental question is whether the evidence that P3 has conferred is sufficient to raise clear and convincing evidence of that fact. And my question is why isn't that evidence that they have introduced, that the two batches of products were identical, why isn't that sufficient to do just that? Because that statement is inconsistent with the record and is inconsistent with the deposition testimony. So the record said that the two orders were placed and each of the orders that P3 put into evidence said that the supplier was permitted to make changes to the products so long as the function and quality would be the same or better as what had been provided previously. So there's no evidence in the record to dispute the fact that the supplier could change components. But there is evidence, is there not, that it didn't, as in the evidence that the products were the same, which is what I see in the declarations? Well, in the depositions, I questioned Mr. Herzinger about both the orders and the products and he said they never looked inside. These structures are microscopic. They are on the order of a millimeter aside. You can't look at the outside surface and see that they're the same. So the question is, was there any basis, any foundation, for Mr. Herzinger to provide any testimony that the samples were the same, that the products were the same? And I questioned him on that and he was not able to put forward any evidence in his deposition other than the order form, which itself said changes could be made. And that's at appendix pages 486 to 488. That was clear testimony that disclaimed any knowledge of the relevant features. And I also deposed Mr. Krause, the CEO of the company, and he said, and I'll quote this, if it was a different structure, I wouldn't know. That's at 499 of the appendix, page 114, lines 20 to 21 of his deposition. He expressly and unambiguously disclaimed any knowledge. Neither of them ever said anybody looked inside the products, looked at the LEDs, or did anything to compare them to. So all they did was say they have an independent belief that the products would remain the same. But in doing so, they are inconsistent with the undisputed record, which is that the supplier could make changes. In addition, we put into evidence information that LEDs are constantly changing and were at that time period. It should not be... Doesn't that just undercut your infringement contentions? No, Your Honor. Why didn't you just amend your complaint and say that the prior art isn't covered? And then you would take the risk that you wouldn't be able to prove infringement with respect to any of them. Your Honor, what you're asking us to do is precisely what the district court did, was to try to distinguish between the prior art and the accused infringing product. And what the district court said is, what we did wrong was being indiscriminate, not discriminating between the prior art and the accused product. And that is flipping the burden onto the plaintiff to establish that the claims are not invalid. The initial burden in all of this, clearly and unambiguously throughout the law, is that the defendant must come forward with admissible evidence, reliable evidence, to show that they're the same. They cannot just assume that components remain the same. And the fundamental issue that you're arriving at is, well, what happens if some of the products that are included in a royalty base later on are inconsistent with the infringement allegations? The infringement allegations are only ever about the samples that are tested. We have no basis, no ability to exclude or include anything without information from the defendant. And if the defendant wants to come forward and say, well, these products are different, they are inconsistent with your infringement allegations and therefore do not infringe, then, of course, we would analyze that information and determine what steps to take. Again, P3 did not come forward with any evidence to show that they were the same or different. But the relative... You're discounting the declaration then. I mean, you say, well, the declaration was undercut by the testimony in the depositions, but that is evidence that they were similar, or that they were identical. That was the contention. And it doesn't seem like you came up with anything to the contrary. But, Your Honor, this is summary judgment. That's right. And your obligation on summary judgment, once they've established a prima facie case, is to put in something that would indicate that there's a triable issue. And I'm wondering what you put in, other than to say it's not so, that created a triable issue. Well, but that's precisely the point, Your Honor, is we put forward evidence that neither of the witnesses had any ability or foundation to testify to the facts they were stating. It cannot be the district court must accept as true a declaration that's inconsistent with the record. What Your Honor is saying is if you put in a declaration, even if that declaration is unfounded and disputed through deposition testimony where the witnesses say, well, of course I didn't know, I never looked, but I feel like it probably is, if that's sufficient to allow summary judgment of invalidity under the clear and convincing evidence standard, well, Your Honor, that's inconsistent with eye for eye, the burden to establish invalidity, it's inconsistent with the Supreme Court standard for summary judgment, which says the moving party must first come forward with, not just fictional evidence, but actual evidence to support the theory that it's providing. And I find it difficult to rationalize this idea that once somebody says, I don't know, and Mr. Krause said it clearly, if there was a different structure, I wouldn't know. That's his sworn testimony under oath. If he then said in a declaration, I do know, well, how can you look at the former and say, well, I can discount that and believe the latter, I believe it. That seems fundamentally inconsistent with summary judgment practice. I also believe, Your Honors, that all of this is inconsistent with what this court has done in its prior cases. That's Van Moore and Evans. Yes, Your Honor, thank you very much. In both of those cases, there was admissible evidence showing that the products were the same, and not just the product as a whole, but the relevant components. In Evans' cooling, the evidence was that the engine was the precise reverse flow cooling engine that the plaintiff had identified as infringing. There was no suggestion. Again, there the product was a Corvette. There was no suggestion that the defendant could have merely said, well, we sold Corvettes in the past, and therefore it is enough for me to say we sold Corvettes. Instead, they had to link the reverse flow cooling engine that was accused of infringement with the one that was sold prior to the applicable date, and that was done. That's also true in Van Moore. They were affidavits and documents, and they weren't just naked conclusions. They're the same. They were affidavits and documents that showed that the relevant components of the infringing caulking guns were identical to the prior art. I would also say this, Your Honor, going back to your prior question, comparing and saying they were identical has to be, at least at this point, if there's nothing more than a naked conclusion, that's expert testimony. That's opinion. Saying that the layers of the LED internally when you open them up are the same without ever looking inside, there may be an expert who can make that conclusion. That cannot be what a fact witness can simply state without explaining how or why they reached that conclusion. And just recalling his testimony, during my deposition of Mr. Herzinger, one of the things that came up was I asked him, well, how can you tell they're the same? And he said he turned the bug traps on and he saw the light. The relevant light here is light from an LED. It's not even visible to the human eye. So what he was doing was he was just providing naked testimony saying, I personally believe, without support, that they're the same. Okay. Let's hear from the other side. We'll save your rebuttal, Mr. Herzinger. Thank you, Your Honor. Okay. Ms. Del Valle. Are you there, Ms. Del Valle? Yes, I'm sorry. Can you hear me? Yes, I hear you now. Yes, please proceed. Okay. Thank you, Your Honor. May it please the Court. Notwithstanding the intricacies advanced by Soviasis on this appeal, the issue here is straightforward. Soviasis alleges that P3's P7880 bug trap infringes its 207 patent. It's undisputed that the P7880 was on sale and sold prior to the critical date of the 207 patent. Under Evans and Van Moore, the district court found that Soviasis' infringement allegations satisfied P3's burden to show anticipation by clear and convincing evidence. Soviasis seeks to avoid the straightforward results. It argues that since P3 received two shipments of the P7880, one before and one after, that P3 needs to show that units from the first shipment embody the claims of the 207 patent. Dr. Counsel. Counsel. I'm sorry. Isn't it true, though, that Evans and Van Moore both addressed situations where identity was conceded or at least assumed? And here your friend on the other side is saying they're not conceding identity. The district court looked at that and found that Soviasis treated all units as identical throughout for all infringement purposes and can't have it both ways and say that they're not identical for anticipation purposes. Why does the district court find that Soviasis treated them as identical? Well, because Soviasis analyzed one LED found in a sample and deemed it representative of all P7880s for purposes of infringement. It seeks damages for the P7880 no matter from which shipment the sale arose, and it seeks an injunction to further sale of the P7880, which Mr. Krause's declaration shows that those units that are still in the process are from the first shipment. Some of them at least are from the first shipment for which they seek injunction. What about the argument that Mr. Krause did not really have first-hand knowledge basis to say that all of the products from both shipments are the same? Well, the thing is that Soviasis accuses all products of being the same, and that since all products are being accused, they're making the representation that they're all the same. And there's no reason not to believe that they're the same. That's what Soviasis is saying about it. And in its statement of undisputed facts, it states that the P7880 infringes the 207 patent. It doesn't limit it to the second shipment or the first shipment. And it doesn't, as the court, as Mr. Eisenberg admitted, that he doesn't know which one he tested either. But they're accusing them all. And the district court said, if you're accusing them all for infringement, you can't have it both ways and not have it for anticipation. And so it was their accusations of infringement that established that they're all the same. Because it doesn't really matter at some point whether they're the same, but because Soviasis says they are. And we believe that they're right. We believe that when they tested one sample and deemed it representative of all products, that that was correct. These are off-the-shelf products that just aren't materially identical to each other just because they're factory-produced. They're not actually crafted. Those crafts that you buy at the farmer's market, they come from a factory and they're all made the same and they're all sold for the same reason. So those allegations and that assumption that they're all the same, that ties all the products together. And the first shipment and the second shipment, they come in the same box. They have the same specifications written on them. And it's undisputed that one of those, that at least 200 of those items were sold prior to the critical date. So Mr. Krause's declaration was not that he looked at, he reverse-engineered or that he did the scanning electron microscopy of the products, but that they had devices from both shipments in the warehouse. They filled orders indiscriminately with... Why wouldn't it have been easy just to do testing of items from both shipments just to confirm the identity assumption? You know, it was the... So Vice's allegations, which established, which satisfied P3's burden to prove by clear and convincing evidence... That wasn't my question. Wouldn't it have been... I mean, that's the same answer I got from the other side. Well, it was your burden. So, I mean, it's their burden to prove infringement. It's your burden to prove invalidity. So why wouldn't it have been easy just to test products from each shipment and say, we've compared them. They're the same. Yeah. It's a very specialized testing that it wasn't the sort of testing that P3 was able to do. And it was very hard to find out what the testing actually was because it was not disclosed. And we had a number of issues in the court below about the lack of disclosure regarding the testing methods. But we... Lack of disclosure from you or lack of disclosure from the other side? Lack of disclosure from the other side of what testing they did so that that could be replicated if P3 wanted to. But we didn't find the testing from the other side. And, as a matter of fact, there was a lot of resistance to providing anything based on their trade secrets. And we had... So that's why we didn't do it. And, as we said, we didn't believe that it was our burden to do it. But... Were the... Is there any indication in the record as to whether these items, when they were stored in your client's warehouse or whatever, were segregated by shipment or were they just all mixed together, so far as we know? Yes, Your Honor. They were segregated by shipment when they were not... When the cartons were not opened. Once the cartons were opened, you couldn't tell... And they were taken out of the cartons. You couldn't tell from which shipment the product came in. But you knew that when there was a closed shipment with the shipping documents affixed to it, you knew which shipment those products came from. So when they arrived, presumably, obviously, you knew which shipment was which. But my question is, once they arrived and they were stocked in the warehouse, I assume they were stocked not in the original packaging that arrived from China but were stocked in some other form, is there any indication of which items came from shipment number one and which came from shipment number two? Actually, Your Honor, they were stocked in their original shipping cartons. Okay. So that's how you would tell... You could have easily told one from each, right? Certainly. All right. That was where my question was going, so that answers it. Thank you. Your Honor, even if the shipments differ, those are charged with infringement, and that's what the district court found. And that established the material identity between the products. Now, so far as it goes to a lot of supposition, it posits that it was mathematically possible that all sales of the infringing product could have come from the second shipment because it theorizes that P3's inventory might be organized on a first-in, first-out system. That's an unsupported supposition, and it's totally contradicted by Mr. Krause's declaration. Going on to some of the other issues that Solvaysis raises, this case is not about reassigning the burden of proving anticipation or about the standard of proof required by that burden. Then, where Evans both leave that burden undisturbed, the burden remains on the defendant, and it remains on the defendant here. The court in Evans has held that that burden, though, is satisfied by the patent infringement contention themselves. And that's what we have here, is that the alleged infringement and that satisfied P3's burden of proving by clear and convincing evidence that the elements of the claims were found in the product. Another point that Solvaysis raises in its brief that I'd like to address is that Solvaysis contends that P3 is somehow asserting and impermissible practicing the prior art defense. That's nothing to be further from the truth. It's not a case where P3 is attempting to escape infringement by arguing that it's practicing some other device. What it was showing was that the accused device, the P7880, was actually being sold prior to the critical date and was being accused of infringement after the critical date. So it's not at all a practicing the prior art defense that we assert. Now, Solvaysis doesn't discriminate between the two shipments in its infringement contentions. It very clearly, and as a matter of fact, before this court in page 503, it offered the unqualified statement that the relevant infringing product is P3's P7880 uptrap. It doesn't distinguish between the two, and it can't. And it's not a matter of whether anyone can prove the sample tested was from one or the other. It doesn't matter. They're accusing all. They're accusing all products of infringement, alleging that all of them possess all the elements of the asserted claims of the 207 patent. That in itself establishes defendant's burden in this case of proving by clear and convincing evidence. Solvaysis was informed from the very inception of this case that the product it contends infringes was placed on sale prior to the critical date of the patent. Instead of packing up, they doubled down. Throughout this case, and on summary judgment below, and now on this appeal, Solvaysis has been relegated to proffering strange constructs and justification of its poor and unreasonable decision to continue to prosecute this case. We should be at the end of the process. We submit that the district court's decision was correct and should be affirmed. Thank you. Any more questions for Solvaysis? No. No. Okay, thank you. Mr. Eisenberg, you have your rebuttal time. Thank you, Your Honor. There's nothing in this record about testing or P3's inability to seek evidence matching up the products. That's just something that's been added here by counsel and should be given no moment by the court. Was there a battle over your production of your testing methods? There was, Your Honor. And why didn't you produce those? We did produce them. There was no issue with trade secrets that had to do with whether certain testing methods should appear in a public record. We did describe them as scanning electron microscope images, tunneling electron transmission electron microscope images. We explained what testing was done. The issue was there was a witness who had difficulty explaining all of the details of how that testing was done. And that is what it is. Had a defendant asked us, well, which test do we need to run to figure out whether the LEDs are the same? We clearly would have told them that they should have had that information. That's not an issue here. If they had given us an inrogatory, we would have provided them the information in detail. It just is a distraction at this point, in my view, Your Honor. What fundamentally comes up now is this idea of identity. And what Ms. Del Valle said is sole biases necessarily treated all products as identical. And there's a fundamental misunderstanding of how this works. All sole biases could do to prove infringement is to find and dissect a sample that it purchased. The infringement contentions necessarily limited those allegations to products consistent with its infringement theory. As Ms. Del Valle conceded, from the outside, it's not possible for sole biases to distinguish between one or the other. The only party that had any ability to access that information and the party that should have come forward with the evidence was P3, and it chose not to. And that's the fundamental unfairness of how this played out. The district court judge said, you could have done the testing. And that's true. She is correct that sole biases could have. But fundamentally, that shifts the burden to sole biases to disprove an incomplete invalidity theory. That's not how this is supposed to work. Did you ask them to produce to you one product from each shipment so that you could conduct the same test on those two products that you conducted initially on the purchased products? No, Your Honor. We waited for P3 to come forward with the evidence to show that they did. Again, it was not our burden to discriminate, to differentiate. How expensive is this testing? I mean, the fact that everybody just sits there and plays chicken. I mean, is the testing extremely expensive or burdensome? The exact cost, I do not know, Your Honor. But this is litigation. Litigation is costly and expensive. And if you want to establish that a defense exists, you must come forward with some evidence. Now, whether they had to do all the testing or a part of the testing, or at least open up the device and see if even from an optical microscope, which any of us can buy, they look identical. There are things that they could have done that P3 chose not to. They provided no evidence, and that's the issue. And for the court, if it were to do so, to say sole biases should have gone forward to disprove a theory that was never proved in the first instance, that is fundamentally inconsistent with how I understand patent litigation to work. We start with infringement allegations. They come forward with invalidity allegations. And eventually, down the road, we get to damages. And damages are always assessed on what products are consistent with the infringement theory. It is not a general allegation, and it wasn't in Evans' ruling, that all Corvettes infringe. It was all Corvettes with a specific engine. You had to establish that there was a link. In Van Moore, it was not all caulking guns infringe. It was caulking guns having specific features. And that's what's missing from the record here. And one more thing, and Petrie's counsel went back to this theory. She again said, we sought damages for all products. Sorry, may I finish up? No, complete your thoughts. Thank you, Your Honor. The district court, in this case, disclaims that theory and said, that is not the basis of my decision. That was in the rehearing decision. And she said, no. Are there any further questions? Any more questions for counsel? No, thank you. Okay, thank you. Thanks to both sides. The case is taken under submission. That concludes this panel's arguments for this morning. Thank you, Your Honor. The Honorable Court is adjourned from day today.